1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| ONESHARE INTERNATIONAL, ONESHARE HEALTH, LLC, and REVEREND PAMELA WOODSON, | Case No.: 3:20-cv-6207 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| MYRON "MIKE" KREIDLER, Washington State Insurance Commissioner, STEVE VALANDRA, TONI HOOD, and TODD DIXON, | |
| Defendants. | |

Plaintiffs OneShare Health, LLC and OneShare International (d/b/a Anabaptist Health-share) (collectively "OneShare" or the "Ministry"), and plaintiff Reverend Pamela Woodson (collectively "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for Declaratory and Injunctive Relief against defendants Myron "Mike" Kreidler, Steve Valandra, Toni Hood, and Todd Dixon, in their official capacities as employees, agents and/or representatives of the Washington Office of Insurance Commissioner ("OIC") (collectively "Defendants"). Plaintiffs allege based on personal knowledge as follows:

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

## I.  NATURE OF THE ACTION

1.      On March 31, 2020, the OIC ordered Plaintiff OneShare Health to cease and desist ("Cease and Desist Order" or "C&D") from seeking, pursuing, or obtaining "insurance business" in the state of Washington, finding that its health care sharing ministry ("HSCM") failed to qualify for an exemption from insurance regulation under RCW 48.43.009, the state's HSCM safe harbor, even though the Washington legislature expressly gave that provision the "same meaning" as 26 U.S.C. § 5000A, the federal safe harbor, and the U.S. Centers for Medicare & Medicaid Services ("CMS") have found that OneShare was an exempt entity under § 5000A.

2.      The OIC, led by the Defendants, published its Cease and Desist Order in a press release that denounced OneShare Health as a "***sham*** health care sharing ministry that is ***preying on people who think they are buying health insurance***." (Emphasis added.) Since OneShare operates as a unified Ministry of parent OneShare International and wholly owned subsidiary OneShare Health, OIC's action denounced and defamed the entire Ministry, including individual Plaintiff Reverend Woodson (who is a member of OneShare's sharing program as well as its Board of Directors) and other members of the Ministry, in Washington and nationwide.

3.      The Ministry operates in 46 states. In just months, OIC's action has resulted directly in the loss of 31% of OneShare's membership in Washington, previously its third largest state membership just behind Texas and Washington. OIC's action has led directly to lost contributions of $1,462,123 and counting.

4.      The Cease and Desist Order and the false, derogatory and defamatory statements in the press release have led directly to OneShare being named in three class action lawsuits, the most recent of which was filed this past Friday, December 11, 2020. Each of these lawsuits has the potential to destroy the Ministry. Any one of these suits could be a death sentence, and the number of suits only proliferates. This is a critical issue for Plaintiffs and for the entire OneShare Ministry and its members. Unless reversed or invalidated, OIC's actions may destroy the Ministry.

5.      The OIC's harsh scrutiny of OneShare, its general suspicion of HCSMs, and its denial of HCSM safe harbor status to OneShare despite a CMS determination that OneShare

qualified for the same federal safe harbor amount to "especially harsh" (the harshest available) and "non-neutral" (discriminatory) treatment, in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution, and those violations are protectible under the federal Civil Rights Act, 42 U.S.C. § 1983, as stated herein.

6.     The ancestry of the OneShare's health care sharing ministry is key to this case because the meaning of "predecessor" in 5000A is key to this case. Under 5000A, the predecessor must have been established and sharing member medical expenses before the year 2000—*i.e.*, since at least December 31, 1999. Undisputed facts plainly show that OneShare's predecessor is Gospel Light Mennonite Church (the "Church"), which was established in 1995.

7.     OneShare's roots trace to a ministry of the Church, a small Virginia body in the Beachy Amish-Mennonite association of churches. Mennonites are a branch of the Anabaptist tradition, born in the fiery persecutions of the Protestant Reformation. One distinctive tenet of this religious tradition is mutual support for each other's heath care. Members pledge a certain amount of support so that members facing medical expenses can draw on those pledges to meet their needs. Inclusion in these systems has also been a means of outreach to non-Anabaptists.

8.     Courts have recognized that this approach to mutual support is a deeply held religious practice and not a mere program for Church members. *E.g.*, *Bethel Conservative Mennonite Church v. Com'r*, 746 F.2d 388, 392 (7th Cir. 1984). Theologically, it is part of Mennonite religious identity and part of how they both practice their commitment to the fellowship of all believers and spread the faith.

9.     When Congress enacted the Affordable Care Act ("ACA") in 2010, it was concerned the ACA would impose insurmountable regulatory burdens on these religious practices. To avoid that, and in keeping with prior accommodations of similar practices, Congress enacted a "safe harbor" from its insurance mandate for members of HCSMs that meet the ACA's definition at 26 U.S.C. § 5000A. This title 26 of the U.S. Code is better known as the Internal Revenue Code, or "IRC," the source of federal tax law and nearly all federal statutory law relevant to this case. Thus, 26 U.S.C. § 5000A maybe referred to herein as IRC 5000A or just 5000A.

10. Consistent with the ACA, in 2011, Washington enacted RCW 48.43.009, a parallel safe harbor exemption from state insurance regulation for HCSMs that meet the federal definition. In enacting RCW 48.43.009, the Washington legislature acted in response to overzealous efforts by the OIC to regulate HCSMs. In RCW 48.43.009, the Washington legislature explicitly directed that, under state law, HCSM "has the same meaning as in IRC 5000A." Washington fully assimilated federal law on this point.

11. Starting in 2014, Church leaders expanded their HCSM. This HCSM was an internal ministry of the Church, established by the Church in 1995, as a specific tradition of the Church's founding pastor going back four generations. The expansion of this ministry was to continue the mutual support system practiced by Mennonites for hundreds of years. This expansion included the creation of the institutional Plaintiffs, OneShare International and OneShare Health, as a unified parent-subsidiary HCSM in 2015 and 2016. The mission was to expand and share this ministry for Anabaptist Christians with non-Anabaptist Christians as well. This expansion fulfilled the "evangelical purposes" of the OneShare Ministry's bylaws as evangelistic outreach—a core religious tenet of the Church, its leaders, and their Beachy-Amish Mennonite tradition.

12. In 2015-2016, CMS, acting for the U.S. Government, recognized this unified HCSM as qualified for the 5000A federal safe harbor. (This "CMS List" is discussed further below.) Tellingly, of the 107 HCSMs recognized by the U.S. government as meeting 5000A, nearly 90% are Anabaptist, including 52% with *Mennonite* in the name. This is unsurprising since this kind of health care sharing has been a core ministry of Mennonites for 500 years. They essentially invented it during their founding era in the Protestant Reformation and have carried it on faithfully ever since.

13. As confirmation that the U.S. government accepted this parent-subsidiary or parent-child arrangement of the Ministry, in May 2020, the Internal Revenue Service ("IRS"), responsible for enforcing the IRC, granted the application of subsidiary OneShare Health for IRC 501(c)(3) status based solely on its claim that it was and is "organized and operated exclusively" as an IRC 5000A HCSM. Thus, the IRS and CMS, both fully on notice of the Ministry's parent-sub

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -4-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

organizational structure ("polity"), neither raised objections to this polity nor questioned the Ministry's qualification for HCSM status under 5000A.

14.     Despite the CMS ruling, OIC issued its Cease and Desist Order against OneShare on March 31, 2020 and publicly denounced OneShare the following day as a "sham health care sharing ministry that is preying on people who think they are buying health insurance." OIC has twice ignored the U.S. government's determination that OneShare Health is a qualified HCSM and has instead applied an unlawfully and unconstitutionally narrow and idiosyncratic definition of the critical term "predecessor" in 5000A to say OneShare fails to qualify as an exempt HCSM. OIC also has ignored the good faith attempts at legal compliance by OneShare's compliance team led by two former state insurance commissioners, both of whom, before joining OneShare, were Defendant Kreidler's peers and equally competent to assess the requirements of applicable laws.

15.     In so doing, OIC targeted the OneShare Ministry for OIC's harshest treatment. Plaintiffs searched OIC online public newsroom for its use of the word "prey" in its press releases, finding a total of 25 results dating to 2013. In these results, OIC stated unequivocally that preying upon vulnerable people was the worst form of insurance fraud, and then proceeded to apply that description only to OneShare. In no other press release did OIC accuse any organization, let alone a religious organization, of preying on the public, let alone its own vulnerable members. In other words, OIC reserved its harshest treatment for OneShare.

16.     Defendant Kreidler and OIC have targeted HCSMs—religious health care sharing *ministries*—for years, as described below. That history reflects hostility to this form of religious practice. But OIC's especially harsh treatment of OneShare exceeds its harshest treatment applied to any of the scores of secular entities and industries, ranging from health care to gun rights, over which OIC claims jurisdiction. Such non-neutral actions toward a religious ministry constitute unconstitutional religious discrimination. Moreover, since the First Amendment singles out religious entities for special (favorable) treatment, they may never, in any circumstance, be subjected to "especially harsh treatment," as the U.S. Supreme Court has recently reaffirmed. OIC did exactly that to OneShare, and it has harmed the Ministry in profound ways.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

17. OIC's actions have suppressed the Ministry's religious practice and contributions through lost actual and potential members in Washington. They have inspired aggressive inquiries from other state insurance regulators. And they have fueled lawsuits against the Ministry.

18. Specifically, OIC's actions have inspired class action lawsuits against OneShare in Colorado, California, and now Kentucky. OIC's actions supplied a basis and example for the Seattle-based class action lawyers whose own emails produced in discovery show they spoke with Defendant Kreidler about the first in the series of such lawsuits, the day before they filed that first lawsuit (in Seattle). These lawsuits added OneShare only after OIC's especially harsh treatment of OneShare and traded on OIC's disparaging "sham" claims about OneShare. OIC provided the essential basis for each copycat lawsuit to assert OneShare was a deceptive sham. Each one of these class action lawsuits could destroy the Ministry and the same lawyers are threatening more.

19. Defendants' actions may extinguish the Ministry not just in Washington, but nationwide. Defendants' actions rest on a demonstrably incorrect reading of IRC 5000A and unconstitutional discrimination against OneShare based on its choice of polity and its choice of interdenominational ministry to most Christians and not just Anabaptists. And Defendants' actions substantially burden the exercise of Plaintiffs' sincere religious beliefs and exercise, unconstitutionally entangle church and state, and abridge Plaintiffs' free speech,

20. This Complaint seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57, and injunctive relief under 28 U.S.C. § 1343(a)(3) and Federal Rule of Civil Procedure 65. Plaintiffs seek a ruling under 28 U.S.C. § 2201 declaring that OneShare satisfies the HCSM provisions of 5000A and RCW 48.43.009 or a ruling that Defendants' discriminatory grounds for denying HCSM status to OneShare violate the First and Fourteenth Amendments.

## II. JURISDICTION AND VENUE

21. This Court has jurisdiction over Plaintiffs' claim for declaratory relief concerning the meaning of 26 U.S.C. § 5000A and RCW 48.43.009, which assimilates "the same meaning" as 5000A, under 28 U.S.C. §§ 1331, 2201, and 2202. The vindication of OneShare Health's right under RCW 48.43.009 necessarily turns on the proper construction of 5000A. The Court has

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -6-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

jurisdiction over Plaintiffs' First and Fourteenth Amendment claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.

22.     This Court has jurisdiction to issue the requested declaratory relief under 28 U.S.C. § 2201 and § 2202, 28 U.S.C. § 1331, and Federal Rule of Civil Procedure 57.

23.     This Court has jurisdiction to award the requested injunctive relief under 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1331, and Federal Rule of Civil Procedure 65.

24.     This Court has jurisdiction to award reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

25.     Because this case involves violations of Plaintiffs' rights under the U.S. Constitution and 42 U.S.C. § 1983, Plaintiffs are not required to exhaust their administrative remedies. Nevertheless, Plaintiffs have exhausted their administrative remedies in that the Presiding Officer in OIC proceedings has repeatedly issued orders stating that the OIC is without jurisdiction to consider Plaintiffs' constitutional claims and arguments.

26.     Venue lies in the U.S. District Court for the Western District of Washington under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events or omissions giving rise to all claims occurred in this district and Defendants reside in this district.

### III.  PARTIES

27.     Plaintiff OneShare International is a Virginia nonprofit corporation incorporated on May 26, 2015. OneShare International is recognized by the IRS as tax exempt under IRC 501(c)(3) because it is "organized and operated exclusively as" an HCSM. OneShare International was initially named Anabaptist Healthshare, but changed its name to Kingdom Healthshare International and then to OneShare International in March 2019, to align the Ministry with its subsidiary as described below. It is headquartered in Madison, Virginia. OneShare International continues to use Anabaptist Healthshare as a d/b/a.

28.     Plaintiff OneShare Health, LLC, established in Virginia on November 10, 2016, is the single-member limited liability company and wholly owned subsidiary of parent OneShare International. Subsidiary OneShare Health was initially named Unity HealthShare, LLC, but

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

changed its name to Kingdom HealthShare Ministries, LLC, and then to OneShare Health, LLC in March 2019, to align with its parent's unified OneShare ministry. Subsidiary OneShare Health is headquartered in Irving, Texas.

29.     Together, OneShare International (the "parent") and its subsidiary (the "child"), OneShare Health, form an "indivisible Ministry governed by the same Board of Directors and officer corps," as stated in their parent-subsidiary Operating Agreement.

30.     Plaintiff Reverend Pamela Woodson is an ordained Baptist minister who has served for more than two decades in full-time ministry as an administrator and pastoral counselor at First Baptist Church in Tucker, Georgia, where Reverend Woodson resides. She is a member of Plaintiffs' Ministry in two capacities. First, Reverend Woodson joined the Ministry as a sharing program member on March 1, 2020. As one of about 50,000 program members nationwide, she participates in the Ministry's sharing of health care needs among its membership. Second, Reverend Woodson joined OneShare's Board as a voting member ("Director") on July 1, 2020, and she serves on the Board's Finance and Audit Committees.

31.     Defendant Myron "Mike" Kreidler is the Insurance Commissioner for the State of Washington, head of the Office of Insurance Commissioner ("OIC"), and is sued in his official capacity. The Insurance Commissioner is an elected official of the executive branch. Defendant Kreidler is responsible for the operation of the OIC and the March 31, 2020 Cease and Desist Order against OneShare, which he signed, and the April 1, 2020 press release which publicly stated that OneShare was a "sham health care sharing ministry that is preying on people who think they are buying health insurance." The C&D and the disparaging press release constitute the primary enforcement action against and official treatment of the Plaintiffs in this case. This treatment was perhaps the harshest treatment available to Defendant Kreidler. On information and belief, including searches of OIC's online newsroom for comparable OIC press releases in comparable settings, he has applied this harshest of treatments, contextually, only to OneShare. Defendant Kreidler also discussed at least the first in a series of class action lawsuits that have been filed by Seattle lawyers he knows and which have added OneShare as a defendant based largely on the claim that OneShare

was a deceptive "sham" HCSM. On information and belief, he coordinated with the plaintiffs' lawyers in aid of their lawsuits against OneShare.

32. Defendant Steve Valandra is the OIC Deputy Commissioner for Public Affairs and is sued in his official capacity. Defendant Valandra was a member of the Compliance Committee that decided to issue the C&D against OneShare and he approved the April 1, 2020 press release that published that C&D.

33. Defendant Toni Hood is the OIC Deputy Commissioner for Legal Affairs and is sued in her official capacity. Defendant Hood was a member of the Compliance Committee that decided to issue the C&D against OneShare, she guided OIC's enforcement process against OneShare, and she has communicated with the class action lawyers who have sued OneShare.

34. Defendant Todd Dixon is the Acting Deputy Commissioner for Consumer Protection and is sued in his official capacity. Defendant Dixon was a member of the Compliance Committee that decided to issue the C&D against OneShare and he has guided OIC's enforcement process against OneShare.

35. Defendants Kreidler, Valandra, Hood, and Dixon are all officers in the Washington Office of the Insurance Commissioner and are responsible for the enforcement of all Washington state insurance laws, including the safe harbor law at RCW 48.43.009.

## IV. FACTUAL ALLEGATIONS

### A. Health Care Sharing Ministries

36. Nationwide, there are over 100 HCSMs with total membership of about 1.5 million. *See* Alliance of Health Care Sharing Ministries ("AHCSM") at http://ahcsm.org/about-us/data-and-statistics. HCSMs enable people of faith to form a membership community to share the burden of each other's medical expenses. AHCSM at http://ahcsm.org/faq.

37. HCSMs are religious communities that facilitate their members sharing the financial and other burdens of medical needs among themselves. For Christians, the foundational Scripture for this is *Galatians* 6:2: "Carry each other's burdens, and in this way you will fulfill the law of Christ." Other Bible translations describe the action as "bearing" or "sharing." *See id.* ("Bear

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

one another's burdens, and so fulfill the law of Christ.") (NKJV); ("Share each other's burdens, and in this way obey the law of Christ.") (NLT).

38.     Such HCSMs provide a Bible-based, non-insurance approach to health care by facilitating the sharing of medical costs in various ways per program guidelines. These ways range from assigning members to write checks to other members with medical needs, to facilitating other means of reimbursement to members with needs.

39.     Details vary, but the ministry's members essentially make a set monthly contribution to be shared with those who need support to pay medical bills. Some ministries use sharing technology to approve sharing; others assign members to send checks directly to other members. When members incur expenses, they submit the bill to their community, through their ministry acting as facilitator. Expenses that meet the ministry's guidelines are shared and payment is made to the member or directly to the health care provider.

40.     HCSMs are communities of likeminded believers who join together to share and to carry each other's agreed upon medical, health, and associated expenses and other burdens while excluding others that are inconsistent with their shared beliefs. The primary means is contributing to medical expenses as directed by the ministry. For OneShare members (as for many other HCSM members), expense sharing can be accompanied by prayers, encouragement, and participation in a larger Christian fellowship with temporal and spiritual benefits.

41.     The members' mutual commitment includes (a) maintaining biblical discipline and habits that lead to healthy, peaceful lifestyles and (b) finding lower cost alternatives to meet the same health care needs. Both of these elements lead to lower health care costs for each member and for their whole membership community. This allows members' medical needs to be met much more efficiently, faithfully, and biblically than health insurance.

42.     This mutual commitment reduces the shared burdens of all in a concrete way to obey Jesus Christ's "new command [to] love one another." *John* 13:34-35 ("As I have loved you, so you must love one another. By this everyone will know that you are my disciples …."). The result is a sharing community of faith and fellowship with reduced spiritual and financial burdens

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                            -10-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

for all, which contributes directly and substantially to improved mental and physical wellness and health of all members. Members can join more than one HCSM.

43.     While there is no legal obligation to pay for medical expenses, there is confidence and faith that eligible expenses will be met. These ministries have well over 1.5 million members and continue to grow because they meet their members' medical needs and they do so in a way that facilitates and inspires Christian faith, fellowship, and community which, for the health of their members, can be better than medicine. *Proverbs* 17:22; 15:13.

44.     HCMSs are not insurance. HCSMs involve no guarantee of coverage, no promise of payment, and no assumption of risk. This distinction is important. If health care sharing were insurance, it would be regulated as such and it would cease to be a unique, affordable, biblical alternative.

45.     Thirty states have safe harbor statutes for HCSMs. Most of these statutes require HCSMs to use and display, often in specific font type and size, unambiguous public notices that they are not offering insurance and are not guaranteeing payment or assuming legal risk. For example, OneShare's website (https://www.onesharehealth.com/en) states at the bottom of each webpage: "OneShare Health, LLC (OneShare) is not an insurance company but a religious health care sharing ministry (HCSM) that facilitates the sharing of medical expenses among members…. OneShare does not assume any legal risk or obligation for payment of member medical expenses. Neither OneShare nor its members guarantee or promise that medical bills will be paid or shared by the membership. Available nationwide, but please check www.onesharehealth.com/legal-notices for the most up to date [listing]."

46.     OneShare's legal compliance team fully understands these distinction and their legal consequences. Before joining OneShare, Allen Kerr was the insurance commissioner for the state of Arkansas, Nancy Atkins was the insurance commissioner for the state of Kentucky, and Buddy Combs was the first deputy insurance commissioner for the state of Oklahoma. Kerr is the Chief Administrative Officer of OneShare; Atkins is the Chief Regulatory Officer of OneShare; and Combs is the Chief Legal Officer and Acting CEO of OneShare.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -11-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

47.     As explained in sworn Declarations filed along with Plaintiffs' Motion for Preliminary Injunction, to regulate HCSMs as if they were insurance would be to destroy them. Regulatory compliance would fundamentally change who and what they are, against their religious beliefs, and the costs of the compliance alone would make them practically unaffordable.

48.     If HCSMs were regulated like insurance, they would be forced to act and look more like insurance, confusing the public and contributing to the very appearance of "deceptive trade practices" that concern state regulators and fuel class action lawsuits such as the ones that have named OneShare after OIC's actions in this case. HCSMs would be subject to insurance regulators, like the Defendants in this case, who wield substantial enforcement powers and discretion that can abusively, or innocently, cause substantial burdens on religious freedom.

49.     If HCSMs were regulated like insurance, they would face burdensome reporting requirements on details of financial sharing of member medical needs and private member information, including age, sex, and other demographic and categorical information. HCSMs likely would be pressured to conform their religious policies (such as a statement of faith) and their religious communications with members and prospective members (treated as "marketing materials") to regulatory standards that may contradict their shared religious beliefs.

50.     If HCSMs were regulated like insurance, they and their members would face various limitations on how they can interact together for shared religious purposes. They also likely would be pressured not to compensate third parties to promote to and enroll members, meaning insurance agents would or could not offer their clients an HCSM as an option.

51.     Even making HCSMs subject to insurance regulators just for reporting purposes could make HCSMs appear to be insurance, or like insurance, thereby confusing the public. Such reporting also is duplicative and needless since, as IRC 501(c)(3) public charities, HCSMs like OneShare already file annual public reports known as IRS Form 990s.

52.     OneShare provides consistent and unambiguous notice to all members and potential members that it is a health care sharing ministry and ***not*** insurance. OneShare members join OneShare because they desire to participate in a ministry that shares health care burdens. They do

so with clear and repeated notice and knowledge that OneShare health care sharing is **not** insurance. In fact, as part of the application process to become a OneShare member, consumers must certify that they understand that the health care sharing among members facilitated by OneShare is **not** insurance. Many join OneShare precisely because it is **not** insurance but rather an alternative to insurance.

53.     OneShare members join OneShare for religious and practical reasons, all of which contribute directly to their better health and wellness. The OneShare members supplying sworn Declarations (filed with Plaintiffs' motion) explain these common reasons for joining OneShare. The sworn Declarations of OneShare Washington members speak well for all Washington members. All such reasons are all summarized above and below and detailed in the Declarations.

54.     It is useful to remember that HCSMs mean health care sharing **ministries**. They are religious organizations created for religious purposes. For this reason, thirty states have enacted safe harbors to exempt HCSMs from state insurance regulation and Congress did likewise in the ACA, *i.e.*, in 5000A, exempting HCSM members from the ACA's individual mandate to purchase health insurance. These protections preserve their religious freedom.

**B.     The Identical Federal and State Safe Harbor: IRC 5000A/RCW 43.43.009**.

55.     In 2010, Congress enacted the ACA including its "individual mandate." 26 U.S.C. § 5000A(a) (IRC 5000A). This provision requires taxpayers to either carry health insurance or pay a tax. *See NFIB v. Sebelius*, 567 U.S. 519 (2012) (characterizing ACA's shared responsibility payment as a tax). In 2018, Congress reduced the mandate's tax to $0 starting in 2019.

56.     The ACA's requirement that individuals purchase insurance thus would pose a serious First Amendment problem for HCSM members by forcing them to either abandon their religious exercise by withdrawing from HCSMs or to pay a tax penalty.

57.     Congress recognized that requiring individuals to purchase health insurance would pose a serious problem for the religious exercise of HCSM members. Thus, Congress included a "safe harbor" in the ACA to protect ministries that meet its definition of "health care sharing ministry." Under IRC 5000A(d)(2)(B), members of any HCSM that meet the definition are spared the

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

IRS tax for not purchasing insurance.

58.    The key for this case is the fourth requirement to be an HCSM under IRC 5000A(d)(2)(B)(ii), which provides as follows:

The term 'health care sharing ministry' means an organization—

(I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),

(II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

(III) members of which retain membership even after they develop a medical condition,

(IV) which (or a *predecessor* of which) has been in existence at all times since December 31, 1999, *and medical expenses of its members* have been shared continuously and without interruption *since at least December 31, 1999* [emphasis added], and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

59.    On April 1, 2011, Defendant Kreidler, Insurance Commissioner for Washington State, issued a Cease and Desist Order against one of the state's most prominent HCSMs, Samaritan Ministries, on the ground that it was an unauthorized insurance company.

60.    Within days of Defendant Kreidler's order against Samaritan Ministries, the Washington legislature passed an amendment to an existing bill exempting health care sharing ministries from state insurance regulation. This amendment was a swift and direct response to Defendant Kreidler's attempt to regulate HCSMs as insurance.

61.    Washington's safe harbor is identical to, and actually assimilates, the ACA's: "Health care sharing ministries are not health carriers as defined in RCW 48.43.005 or insurers as defined in RCW 48.01.050. For purposes of this section, 'health care sharing ministry' has *the same meaning as in* 26 U.S.C. § 5000A." RCW 48.43.009 (emphasis added).

62.    Thus, according to Washington law, any HCSM that meets the federal safe harbor in IRC 5000A automatically meets the state safe harbor in RCW 48.43.009.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                              -14-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

**C.     Plaintiffs' OneShare Ministry and Its Anabaptist Heritage**.

63.     As provided by their OneShare Operating Agreement, the OneShare Plaintiffs form an "indivisible Ministry governed by the same Board of Directors and officer corps."

64.     As affirmed by the former Arkansas insurance commissioner and OneShare's current chief administrative officer, OneShare is a Christian ministry that "shares" as "one" the collective financial and spiritual burdens of our members—living up to the "OneShare" name.

65.     In the words of the Corporate Chaplain of OneShare, Jeremy Farmer, the Ministry brings together a community of believers that is devoted to wellness, sharing each other's health burdens, and spreading the ministry of Jesus Christ.

66.     As one Washington member of OneShare has explained, OneShare provides members with excellent and affordable service and most importantly with a tangible means to practice their faith.

67.     As another Washington member explains, OneShare allows members to practice their faith together in loving Christian community, putting their faith into action.

68.     As an offspring of the Gospel Light Mennonite Church, OneShare has deep Anabaptist roots. (The term "Anabaptist" generally encompasses various Amish, Mennonite, Brethren, and Hutterite churches.)

69.     For Anabaptists, mutual medical aid plans implement the biblical command to "Bear one another's burdens, and thereby fulfill the law of Christ." *Galatians* 6:2. This command is an expression of Christ's "new command" to love one another. "As I have loved you, so you must love one another. By this everyone will know that you are my disciples …." *John* 13:34-35.

70.     Such sharing of burdens of fellow Christians is modeled on the earliest Christian community that arose in Jerusalem after the resurrection and ascension of Jesus Christ and that "had all things in common; and they began selling their property and possessions, and were *sharing them with all, as anyone might have need*." (*Acts* 2:44-45) (emphasis added). *See also Acts* 6:3; 11:27-29. *See generally Stewardship and Mutual Aid in the Christian Brotherhood*, in J.C. Wenger, SEPARATED UNTO GOD (1951; 1979), at 223-244.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

71.     As reflected in §1.1(b) of the OneShare Operating Agreement, "Early Anabaptists believed in a literal interpretation of the Bible and as they [studied] the Holy Scriptures, they [embraced] as one of their core beliefs that they should care for one another."

72.     Such burden sharing reflects Anabaptists' commitments to faithfully steward and generously share life and resources, and to trust in God and God's Church for security rather than relying upon state benefits or secular insurance companies. As one scholar of Anabaptist faith and tradition has stated: "The Anabaptists believed that those who had been born again would live their economic lives in a way that showed forth their love of God above all and the love of their neighbors as themselves." Thus, Anabaptist churches "have shared the medical expenses of members in need for centuries." OneShare Operating Agreement §1.1(b).

73.     Anabaptists remain the dominant presence in the whole HCSM field, as shown by the list of 107 HCSMs certified by the U.S. government as meeting the federal safe harbor in IRC 5000A ("CMS List"). Of those 107 HCSMs on the CMS List, nearly 90% are Anabaptist, including 52% with *Mennonite* in the name. Plaintiff OneShare International (Anabaptist Healthshare) is number 106 on that list.

74.     Based upon this tradition, the Seventh Circuit upheld IRC 501(c)(3) status for a Mennonite church because "we are fully convinced that the Medical Aid Plan was simply another form of the various mutual aid plans established and used by the Mennonites in general to further their strongly held religious belief that they must 'bear one another's burdens.'" *Bethel Mennonite Church*, *supra*, 746 F.2d at 392 (quoting *Galatians* 6:2).

75.     Plaintiffs' Board still believes in this "literal interpretation of Holy Scripture." OneShare Operating Agreement §1.1(b).

76.     The mission of OneShare is captured on its website: "Our core values can be summed up in related biblical commands. The first is to thoroughly love both God and your neighbor (e.g., *Matt.* 22:36-40; *Mark* 12:28-34; *Luke* 10:25-28), the 'greatest commandments' in all of Scripture. The second is to carry the burdens of others (e.g., *Galatians* 6:2) and care for them as one would oneself, often called the Golden Rule, and epitomized in the Parable of the Good

Samaritan (*Luke* 10:25-37). This was the ministry of Jesus, and OneShare Health is passionate about finding creative and inspiring ways to facilitate such ministry to and among Members, staff, and other charitable organizations." https://www.onesharehealth.com/en/about.

**D.   The Church Predecessor of Plaintiff OneShare Ministry**.

77.    In 1995, Gospel Light Mennonite Church (the "Church") was formed in Gordonsville, Virginia, by Pastor Eldon Hochstetler, who remains its senior pastor.

78.    The Church is a small body in the Beachy Amish-Mennonite association of churches. "[T]he Beachy Amish-Mennonite/Fellowship movement [left] the Old Order Amish at mid-[20th] century and adopted evangelical/revivalist methods and theology." Cory Anderson, *Who Are the Plain Anabaptists?*, JOURNAL OF AMISH & PLAIN ANABAPTIST STUDIES, vol. 1, no. 1 (2013), at 37, https://kb.osu.edu/handle/1811/54897. "Beachys believed that outreach and prose-lytizing were Biblical commands." Global Anabaptist Mennonite Encyclopedia Online (https://gameo.org/index.php?title=Beachy_Amish_Mennonite_Fellow-ship#Church_Life_and_Structure). The Church had four founding families. At the Church's founding in 1995, the Church had about 30 congregants. At its peak, it has had as many as 100 congregants. It currently has approximately 50 congregants.

79.    Pastor Eldon Hochstetler, his father, his grandfather, and his great-grandfather have all been Anabaptist ministers, each of whom helped establish Mennonite churches with mutual aid and health care sharing programs in Indiana and Virginia. Those churches continue to practice mutual aid today, consistent with five centuries of unbroken Mennonite tradition.

80.    Pastor Hochstetler also served for over 20 years as administrator of a Mennonite nursing home whose Vision includes: "To Exalt the Name of Jesus in everyday experience as a way of life. To Reflect the Spirit of Christ as we provide health care with love…. To Support World Evangelism …."

81.    Consistent with the Hochstetlers' lineage, the Church established the Gospel Light Mennonite Church Medical Aid Plan ("Plan") as a ministry of the Church, to serve primarily its members. Both the Church and the Plan were unincorporated parts of the same Christian body.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -17-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

82.    Over time, Church leaders, including Pastor Hochstetler and his son Tyler, decided to expand the Church Plan's ministry by serving and sharing the burdens of the larger body of Christians, while continuing to serve Anabaptist members.

83.    They embraced this outreach with the fervor of the "evangelical/revivalist methods and theology" of their Beachy Amish-Mennonite heritage, executing Christ's command to "be my witnesses in Jerusalem, and in all Judea and Samaria, and to the ends of the earth." (*Acts* 1:8).

84.    The unifying principle was the same: *Galatians* 6:2's commandment to "carry the burdens" of "other Christians" and so "fulfill the law of Christ." *Id*. Implementing this vision proceeded in two phases.

### 1.    Phase One: Extending the HCSM Ministry Tradition from the Church to Like-Minded Anabaptist Christians.

85.    Phase one expanded the Church's HCSM ministry within the Church and others in the Beachy Amish-Mennonite association of churches. This phase culminated in May 2015 with the incorporation of Plaintiff Anabaptist Healthshare (renamed OneShare International in March 2019).

86.    As the Church's founding pastor and OneShare's incorporator and initial director, Pastor Hochstetler signed its bylaws, which declare its "Purpose" to extend the HCSM started by the Church to the broader "Amish and Mennonite community for medical-sharing, physical needs-sharing, financial stewardship, and ***evangelical purposes***" (emphasis added).

87.    By July 2015, the Ministry obtained two vital statuses under the IRC based on its "organization and operation exclusively" as a traditional HCSM.

88.    First, the IRS granted OneShare International's application for IRC 501(c)(3) tax-exempt status. Next, CMS granted OneShare's request for HCSM status under IRC 5000A. Thus OneShare became number 106 on the CMS List of the 107 HCSMs recognized by the U.S. government as meeting 5000A.

89.    The IRC 501(c)(3) and IRC 5000A applications both detailed the Ministry's roots in its Church predecessor dating to its formation in 1995. Both explained how the members of the

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

Church Plan continued to have their health sharing needs met "without interruption." The U.S. government was satisfied that the Ministry met IRC 5000A.

**2. Phase Two: Extending the HCSM Ministry Tradition from the Church to Like-Minded Non-Anabaptist Christians**.

90.     Consistent with its bylaws' "evangelical purposes," the Ministry initiated phase two on November 10, 2016, by adopting an organizational structure, or religious "polity," to grow its ministry while holding true to its core religious beliefs.

91.     The Ministry adopted a particular parent-subsidiary polity by forming a single-member limited liability company, Unity Healthshare, LLC, renamed OneShare Health, LLC in May 2019 (further reflecting its integrated ministry).

92.     This polity allows a nonstock entity to wholly "own" another and served vital religious purposes for the parent: it enabled the child to serve non-Anabaptist members while the parent continued to serve Anabaptist members. At the same time, it provided the parent complete authority, discipline, and control over the child's governance, religious beliefs, and practices.

93.     The purpose and effect of this polity choice are clear from the governing law and organizational documents. First, under IRC doctrine, and as reflected in Schedule R of the Ministry's annual Form 990 filings, the child is treated as a "component part" of the parent. Second, under the parent's bylaws, the child is "wholly owned by [the parent], governed by its Operating Agreement with [the parent], managed by the Board of Directors of [the parent], and treated as part of [the parent] by both the IRS and [the parent]." Third, under the parent-child Operating Agreement, the "Board of Directors of [the parent] shall have sole authority over the [child] and its management in accordance with the Bylaws of [the parent]." Fourth, this parent-child polity thus forms an "indivisible Ministry governed by the same Board of Directors and officer corps." OneShare Operating Agreement § 2.1.

94.     Though the parent specializes in serving the ministry's over 5,000 Anabaptist Christian members and the child in serving the ministry's 48,000 other Christian members, it is one indivisible ministry dedicated to the same Scripture of the same Lord, Jesus Christ. And the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -19-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

same Board and officers oversee, manage, and shepherd it all.

95.     All members (Directors) of the OneShare Board subscribe to the Ministry's State-

ment of Faith in Article II of its Bylaws:

## ARTICLE II
## PURPOSE

In Galatians 6:2 the Apostle Paul instructs believers to, "Bear one another's bur-
dens, and so fulfill the law of Christ." II Corinthians 8:14 further explains, "At the
present time your plenty will supply what they need, so that in turn their plenty will
supply what you need."

**The purpose** for the formation of this Corporation is to enable followers of Christ
to bear one another's burdens and:

1. **To associate** within the Amish and Mennonite community for medical-sharing,
physical needs-sharing, financial stewardship, and evangelical purposes ….

2. **To promote** the biblical concept of mutual aid sharing ….

3. **To create funds** [for charitable work] ….

4. **To remain faithful** to this Statement of Faith:

We believe the Bible alone is the inspired Word of God; therefore it is the final and
only source of absolute spiritual authority.

We believe in the triune God of the Bible. He is one God who is revealed in three
distinct Persons – God, the Father; God, the Son; and God, the Holy Spirit.

We believe Jesus Christ was God in the flesh – fully God and fully man. He was
born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins,
was bodily resurrected on the third day, and now is seated in the heavens at the right
hand of God, the Father.

We believe that all people are born with a sinful nature and can be saved from
eternal death only by grace alone, through faith alone, trusting only in Christ's aton-
ing death and resurrection to save us from our sins and give us eternal life.

We believe in the bodily resurrection of all who have put their faith in Jesus Christ.

All we believe and do is for the glory of God alone.

96.     The Directors of the Ministry all embrace that same Statement of Faith, serve the

same Triune God based on His Word (the Bible) as their sole source of spiritual authority, and are

committed to Christ's "Great Commission" of evangelism to save human souls from eternal death

by faith in Christ. Their faith traditions are part of their common Christian calling and shared

spiritual heritage.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

97.     Such outreach is particularly vital to their predecessor, Gospel Light Mennonite Church, which fathered OneShare's Anabaptist parent and its evangelistic child OneShare Health. In more ways than one, the child serves the evangelical purposes of the parent to reach more souls for Jesus Christ. As the OneShare Statement of Faith succinctly concludes: "All we believe and do is for the glory of God alone."

98.     For evangelistic reasons, the Board decided to open membership in the child OneShare Health to anyone professing core Christian beliefs as set forth in the five-part creedal statement below (also at https://www.onesharehealth.com/en/about).

**1.8 Our Statement of Beliefs**. With our origins in the Anabaptist faith:

[1] We Believe in the authority of Scripture and the sanctity and dignity of every human life created by God with special meaning and purpose. II *Timothy* 3:16; *Psalm* 139:13-14.

[2] We Believe that every individual has the constitutional and religious right and duty to worship God in freedom. 2 *Corinthians* 3:17; U.S. Const. amend. I.

[3] We Believe and agree in the biblical and ethical principle of sharing with those who are less fortunate and who experience medical needs. *Galatians* 6:2.

[4] We Believe and agree that it is our responsibility to God and our fellow Members to engage in accountable, healthy living, and to avoid habits and behaviors which are harmful to the body. 1 *Corinthians* 6:19-20.

[5] We Believe in the power of prayer to save lives, to heal lives, and to unite our Members in common purpose and community, and we believe that prayer should be a fundamental practice of daily life. 1 *John* 5:14; *Phil*. 4:6-7.

99.     This approach aligns OneShare Health with the core doctrine and ministry purpose of its predecessors—parent OneShare International and the Church—while allowing for differences among Christian members (whether Anabaptist or non-Anabaptist) on secondary points. As the Board has explained: "After nearly five centuries of this [Anabaptist] faith tradition and the refining fire of persecution for that faith, the directors of [the Ministry] still believe in a literal interpretation of Holy Scripture and hope to take that care and conviction to those who share our Statement of Beliefs." OneShare Operating Agreement §1.1(b).

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

E.   **Federal Government Recognition of OneShare Ministry as an HCSM and a Tax-Exempt Organization**

100.   On November 10, 2016, the same day the Ministry created its subsidiary, it notified CMS of this change in "status or operation." Its notice stated: "Anabaptist Healthshare will also be operating under the name 'Unity Healthshare' [and] Unity Healthshare will be a subsidiary of Anabaptist Healthshare." It further explained that its "health care sharing ministry will continue to share medical expenses ... but its emphasis has shifted from Mennonite ministries to a broader demographic."

101.   CMS acknowledged the notice without objection and did not question the Ministry's ongoing HCSM status.

102.   At no time has CMS or any other agency of the U.S. government objected to Plaintiffs operating their HCSM ministry through their chosen polity.

103.   On February 3, 2020, the Ministry invited the IRS to review its IRC 5000A status. Child OneShare Health filed an application for tax-exempt status on the *sole basis* that it qualified as a "5000A HCSM," proving each element of 5000A.

104.   The IRS granted that application on May 21, 2020, effectively accepting OneShare's claim to 5000A.

105.   Thus, the predecessor Church Plan continues through its offspring to serve without interruption its members, which number more than 5,000 Anabaptist and 48,000 non-Anabaptist Christians nationwide. This robust Christian community practiced their shared faith in Washington, as elsewhere, until OIC defamed it and banished it from Washington.

F.   **The OneShare Ministry's Commitment to HCSM Compliance**

106.   At all times relevant to this matter, the Ministry's management has acted diligently and proactively to remain within the 5000A HCSM safe harbor and to ensure the health care sharing ministry facilitated by OneShare complies with applicable laws and does not operate or present itself as constituting "insurance" in any form.

107.   The Board that governs the integrated Ministry actively oversees the Ministry's

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                        -22-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

compliance and receives reports from its senior management, not just during quarterly Board meetings but weekly Board calls.

108.     OneShare's Board and senior management team include among their members two former state insurance commissioners and one former state deputy insurance commissioner.

109.     Allen Kerr, the chief administrative officer of OneShare, is the vice chairman of the Board, a member of its Executive Committee and its Legal Affairs Committee, and the chairman of its Finance Committee. For the five years prior to joining OneShare early this year, Kerr served as the Insurance Commissioner for the State of Arkansas. Prior to that, Kerr served three terms as an elected member of the Arkansas House of Representatives. He also was a licensed insurance agent and small business owner for over 30 years. As Arkansas Insurance Commissioner, he was a member of the National Association of Insurance Commissioners ("NAIC") and many of its committees and of similar associations. As an Arkansas legislator, Kerr was Vice Chairman of the House Insurance and Commerce Committee and Chairman of the Joint Committee on Public Retirement and Social Security Programs.

110.     Nancy Atkins is the chief regulatory officer of OneShare. Prior to joining OneShare in January 2020, Atkins served as the Insurance Commissioner for the State of Kentucky, where for three years she oversaw the regulation of the state's insurance market. Atkins also served as a Board Member for the National Insurance Producers Registry and was an active member of the NAIC and the Federal Advisory Committee on Insurance. Atkins has over three decades experience working in the health insurance industry.

111.     Buddy Combs currently serves as Chief Legal Officer and Acting Chief Executive Officer of OneShare. Before joining OneShare in January 2020, Combs was First Deputy Insurance Commissioner for the State of Oklahoma.

112.     Together, former Insurance Commissioners Kerr and Atkins and former Deputy Commissioner Combs oversee OneShare's regulatory staff and compliance efforts. Atkins and Combs were actively engaged in these efforts prior to OIC's actions challenged in this case.

113.     During their respective terms as state Insurance Commissioners, Kerr and Atkins

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -23-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

were peers of more than fifty other U.S. state and territorial insurance commissioners, including Defendant Kreidler. Kerr, Atkins, and Combs are familiar with the challenges state insurance regulatory officials face, including but not limited to rising health coverage needs in this time of COVID-19. On a daily basis, OneShare compliance team members are in contact with state regulators to answer their questions about the Ministry and hear their concerns.

## G.    The OIC Investigation of OneShare

114.    By letter dated July 17, 2019, OIC told OneShare that it was "investigat[ing] to determine whether OneShare … meet[s] the statutory definition of a Health Care Sharing Ministry under RCW 48.43.009 and [IRC 5000A]."

115.    The Ministry fully cooperated with the OIC investigation throughout its investigation, including producing a substantial number of documents and providing multiple emails and letters with detailed substantive responses to OIC questions.

116.    The Ministry's cooperation included an offer from its counsel to make a presentation to OIC to explain the Ministry in more detail and to address any questions. OIC did not accept this offer. OIC admits that its investigation was not over a consumer complaint and that OneShare cooperated throughout OIC's investigation.

117.    The Ministry expected the investigation in Washington to resolve with the same outcome as had occurred in the other states with safe harbors and at the federal level—*i.e.*, recognition that OneShare was an HCSM within the meaning of the safe harbor.

118.    Throughout OIC's investigative process, the Ministry believed in good faith that it met all federal and state requirements to qualify for the IRC 5000A safe harbor that is assimilated into RCW 43.43.009. Such good-faith belief was more than justified given that:

(a) The relevant federal regulator—CMS—had recognized parent OneShare International under § 5000A based on "a predecessor"—the Church Plan—dating to 1995.

(b) CMS had not objected to the parent's notice that it would carry out its evangelical purposes to a broader Christian community through its subsidiary OneShare Health.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

(c) RCW 48.43.009 mandates the "same meaning" of HCSM as the federal defini-
tion that had allowed Plaintiffs' Ministry to operate for years without incident.

(d) The Georgia courts explicitly held in another context that the Ministry's
"wholly-owned subsidiary [was] also an HCSM whose members qualified for the
exemption from the individual mandate to the same extent as [the parent]."

119.    Despite its offers to make a presentation, provide additional documents, and answer
questions, OneShare and its legal counsel received no communications from OIC for more than
five months from late October 2019 until late March 2020.

## H.    The Deep Deficiencies and Discrimination in OIC's Investigation and Enforcement Actions.

120.    Throughout the OIC investigative process, the Defendant regulators and other OIC
officials repeatedly decided that First Amendment principles were irrelevant to deciding which
ministries qualified for the HCSM safe harbor and failed to consider available federal applications
of the 5000A safe harbor definition in determining the meaning and application of the RCW
48.43.009 safe harbor.

121.    Leslie Pearsall, OIC's lead investigator, was instructed by her supervisor that taking
into account "the federal and state constitutions concerning religious liberty and religious free-
dom" was "not an area we were going to focus on." Pearsall's investigation report is bereft of any
constitutional analysis.

122.    Although Washington's Assistant Attorney General ("AAG") is available to give
OIC advice on constitutional issues, OIC does not appear to have ever sought advice from the
AAG on the "constitutional issues" governing OneShare and the interpretation of the safe harbor
law.

123.    In March 2020, the OIC Compliance Committee (which included Defendants
Hood, Valandra, and Dixon) decided whether to classify OneShare Health as an HCSM under the
IRC 5000A safe harbor that is assimilated into RCW 48.43.009 or to take enforcement action
against it.

124.    The March 19, 2020 summary memorandum provided to Compliance Committee

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1  members prior to their vote does not even mention the First Amendment or the constitutional ne-

2  cessity of avoiding discrimination against the Plaintiffs' ministry in interpreting the safe harbor

3  law.

4      125.    The summary memorandum also omitted any mention that the federal CMS and

5  IRS had concluded that Anabaptist Healthshare (now renamed OneShare International), the parent

6  of OneShare Health LLC, was recognized as an HCSM as defined in 5000A (and thus RCW

7  48.43.009) or that its predecessor was the Church Plan established by Gospel Light Mennonite

8  Church in 1995.

9      126.    The Compliance Committee did not undertake any legal research beyond the sum-

10  mary memorandum to determine the correct interpretation of RCW 48.43.009 or of 5000A.

11      127.    Defendant Valandra never sought any guidance from the AAG on the governing

12  First Amendment before taking the lead on drafting the OIC press release that defamed OneShare

13  as a "sham" that was "preying" on the public.

14      128.    Defendant Hood, the Deputy Commissioner for Legal Affairs, testified in a 30(b)(6)

15  deposition that "*OneShare was cooperative during the investigation*," a mitigating circumstance

16  that "gets you consideration" and means "*we don't call you names*." (Emphasis added.)

17      129.    A total of five sworn 30(b)(6) depositions by OIC proves its utter lack of foundation

18  for its actions against OneShare.

19      130.    It is clear that OIC found no evidence of fraud by OneShare at any point in its

20  investigatory process. OIC specifically admits it "did not determine that OneShare deliberately

21  misled customers," and the record reveals no fraud, misleading, or other basis for name-calling.

22      131.    OIC's 30(b)(6) witnesses admitted that at the time OIC commenced its investiga-

23  tion of OneShare, it had received at most four (4) complaints from consumers about OneShare, but

24  that there was no follow-up by OIC's Consumer Affairs Program (CAP) to see if these few com-

25  plaints were valid, if any one from OneShare had engaged in a representation to the consumer, or

26  what action OneShare had taken toward its members to resolve their concerns.

27      132.    OIC's 30(b)(6) deposition witnesses admitted that at least three of these four

complaints either were based upon a misunderstanding by the consumer or had already been re-solved by OneShare in an appropriate manner prior to the issuance of the C&D, such as by pro-cessing the claim consistent with OneShare program guidelines, by covering the claim even though it was outside the program guidelines, or by refunding the member's payment and application fee. OIC admits it did not examine OneShare's plan to determine if any of the complaints about not getting paid were valid.

## I.     The OIC Cease-and-Desist Order and Defamatory Press Release.

133.    On March 31, 2020, the OIC issued a Cease and Desist Order that accused OneShare of engaging in the unauthorized business of insurance in Washington. *In the Matter of OneShare Health, LLC*, Order No. 20-0250 (OIC March 31, 2020), available at https://for-tress.wa.gov/oic/consumertoolkit/Orders/OrderProfile.aspx?Or-derNumber=7EqWQ6SJqgkeBLGKKbt%252BsGw%253D%253D. The next day, OIC announced the Cease and Desist Order in a press release that described OneShare as a "***sham health care sharing ministry that is preying on people who think they are buying health insurance***." Wash-ington OIC, *Kreidler orders OneShare Health LLC to stop selling insurance in Washington state* (April 1, 2020), available at https://www.insurance.wa.gov/news/kreidler-orders-oneshare-health-llc-stop-selling-illegal-insurance-washington-state (emphasis added).

134.    The C&D set out each element of 5000A, including "(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999" and (V) annual audit requirement. C&D ¶16.

135.    The C&D found that OneShare did "not meet the legal definition of" the safe harbor because it failed two elements of IRC 5000A/RCW 48.43.009: OneShare was not a successor to a "predecessor" under element (IV) and it had not performed all annual audits under element (V). C&D ¶¶5-9. Second, the C&D found that OneShare was in fact engaged in the unauthorized busi-ness of insurance. C&D ¶¶5-9.

136.    OIC's main argument rejecting the safe harbor was that parent OneShare

International (Anabaptist Healthshare) could not be "a predecessor" of child OneShare Health, because the parent "serves a different religious community than OneShare serves": "OneShare explained that [Anabaptist's] membership focuses on members of the traditional Anabaptist church …. On the other hand, OneShare members are not required to be practicing Anabaptists …. Instead, each member must attest to OneShare's Statement of Beliefs which is founded on Biblical principles. OneShare explained that creating OneShare allowed a larger community to take advantage of healthcare sharing services in accordance with their faith. ***This distinction in beliefs between the two sets of members runs contrary to the continuous sharing requirement for HCSMs***." C&D ¶¶6-7 (emphasis added).

137.    OIC's conclusion drawn in the last sentence above misconstrued the safe harbor. Moreover, it exceeded the competence and constitutional authority of the government.

138.    The C&D ordered OneShare to cease operating in Washington but allowed the Ministry to continue serving its existing members (for now). OIC separately proposed a $100,000 fine to OneShare.

**J.    OIC's Continuing Refusal to Consider Constitutional Issues or Constitutional Avoidance Considerations in Its Adjudicative Process.**

139.    After receiving the C&D, OneShare requested a stay of its enforcement.

140.    On May 15, 2020, the Presiding Officer in the OIC proceedings denied OneShare's request for a stay, but with mixed results.

141.    The Presiding Officer found in OneShare's favor on OIC's assertion that OneShare had failed to satisfy specific audit requirements under 5000A. Specifically, the Officer ruled that, since "OneShare has completed the audits through 2018" and its completion of 2019 was "hindered by litigation out of state" (the obstinance of a third party), "any shortcomings in this area" were not a "sufficient basis to justify a cease and desist order."

142.    Such audit shortcomings were resolved after OneShare obtained judicial relief from such obstinance in the out-of-state litigation. Nothing prevents OneShare from meeting this audit requirement now and in the future, satisfying this element of the safe harbor.

143.    On the issue of "predecessor," the Presiding Officer acknowledged that the "Center for Medicare and Medicaid Services determined [that parent] Anabaptist Healthshare met the definition of health care sharing ministry under the federal statute."

144.    As thus acknowledged by the Presiding Officer above, this determination by the U.S. government's found all elements of 5000A satisfied, including the predecessor requirement.

145.    The Presiding Officer nevertheless accepted OIC's predecessor finding, ruling that, "[a]lthough Anabaptist Healthshare was found to meet this requirement," parent Anabaptist Healthshare and child OneShare Health were "legally separate entities." Having thus found the safe harbor unmet, the Officer found OneShare's "plans appear to operate as insurance."

146.    In multiple scheduling orders, the most recent dated October 29, 2020, the Presiding Officer has stated unambiguously that "this tribunal will ***not make any determination*** regarding OneShare's as applied ***constitutional challenge*** to OIC's enforcement action." (Emphasis added.)

147.    The C&D remains in effect.

**K.    OIC's Unique Predecessor Requirement: Child Must Swallow Parent**.

148.    OIC permits multiple HCSMs to operate in Washington, including at least the following four: Samaritan Ministries, Christian Care Ministries (d/b/a Medishare), Christian Healthcare Ministries, and Altrua Healthshare. All four, like OneShare International, were found 5000A-compliant by the U.S. government and entered on the CMS List. OIC makes the distinction, however, that those four ministries were all formed as legal entities before 2000, whereas OneShare was not.

149.    Though the safe harbor allows for "a predecessor" to have been in existence and continuously sharing expenses since 1999, OIC interprets "predecessor" to mean an entity that merges with its successor and ceases to exist.

150.    OIC's senior investigator who led the investigation of OneShare explained that OIC applied a narrow, specialized definition of "predecessor" in interpreting the language of IRC 5000A and RCW 48.43.009, as follows:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -29-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

[A] predecessor is a company that becomes its successor in order to be the predecessor. And you know, I don't—I don't know a lot of the technical legal change that has to happen for a predecessor to become a successor other than that they essentially—the—the predecessor becomes the successor and no longer exists once the successor is formed.

151.    Lacking a source for this narrow definition in the text or history of 5000A, the investigator admitted to deriving this definition "from my general understanding from accounting classes I took way back when, business law on what those terms are." This investigator's supervisor reiterated and endorsed this definition stating, "By predecessor, [OIC] mean[s] an organization that used to be around but is no longer around."

152.    OIC's interpretation of predecessor means that the parent, OneShare International, cannot be a "predecessor" of the child, OneShare Health, because the parent continues to exist.

153.    OIC's interpretation of predecessor thus forbids various forms of mergers, expansions, reorganizations, and parent-sub relationships from qualifying for the HCSM safe harbor.

154.    OIC's interpretation of predecessor has serious implications for the polity choices of religious organizations such as the OneShare Ministry, as explained below.

**L.    OIC's Derogatory and Defamatory Statements about OneShare.**

155.    Defendant Kreidler's press release announcing the C&D that OneShare is a "sham health care sharing ministry that is preying on people who think they are buying health insurance" is unsupported.

156.    As noted above, Defendant Hood has testified that "OneShare was cooperative during the investigation," a mitigating circumstance that "gets you consideration" and means "we don't call you names." And OIC admits it "did not determine that OneShare deliberately misled customers," and the record reveals no fraud, misleading, or other basis for name-calling.

157.    Nothing in the OIC record except the derogatory and defamatory press release itself suggests OIC doubted the Ministry's good faith in attempting to comply with the requirements to be an HCSM within the 5000A safe harbor or otherwise deserved to be called names.

158.    OIC has not made any finding that OneShare misled or failed to meet the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                          -30-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

expectations of its members. Out of OneShare's (pre-C&D) several thousand members in Washington, no more than 10 had raised any concerns with OIC and none was the basis of issuing the C&D. As explained below, of these few members, OIC admitted that OneShare had resolved some, other concerns were not attributable to any bad action by OneShare, and for others OIC did not actually know if the alleged concerns were substantiated. The overwhelming majority of OneShare's Washington members were content.

159.     Defendants' issuance of the defamatory press release calling OneShare a "sham" that was "preying" on the public was contrary to the usual and expected practices of state health insurance commissioners. This is particularly true in light of the absence of cause or foundation in the investigative record for these allegations of being a "sham" that was "preying" on the public or the vulnerable, including especially OneShare's members and potential members.

160.     There is no comparable entity, religious or secular, that OIC has subjected to such harsh treatment. Among the scores of mostly secular entities over which OIC claims jurisdiction, from health care organizations to gun rights defense organizations, there is no evidence OIC proclaimed any to be preying on the public, let alone on their own members.

161.     Among the HCSMs operating in Washington, there is no evidence that OIC has treated any of them comparably to its harsh treatment of OneShare, such as by calling them names like sham or a predator.

162.     Among the 107 federally certified 5000A HCSMs, there is no evidence that OIC has ever treated any of them—including Samaritan Ministries, OIC's original HCSM target in 2011 that resulted in the state safe harbor—comparably to its harsh treatment of OneShare.

163.     Among all HCSMs, OneShare is the only one denied safe harbor status based primarily upon OIC's self-created "religious community" and "distinction in beliefs" standard.

164.     Among all HCSMs, OneShare may be the only one denied safe harbor status based upon OIC's arbitrary definition of "predecessor" that requires that any child entity must completely swallow its predecessor parent.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                    -31-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

**M.   The Irreparable Injuries to OneShare from the OIC C&D and Press Release and Refusal to Consider Constitutional Requirements.**

165.    The C&D and its defamatory publication by Defendant Kreidler has had devastating consequences for OneShare. In terms of lost reputation, lost goodwill, and lost Christian unity and fellowship, the harm is irreparable.

166.    The Finance Committee of OneShare's Board of Directors calculated the financial harm dating from the March 31, 2020 issuance of the C&D to November 20, 2020: In terms of lost contributions, the loss of 838 Washington members, compared to membership growth nationwide, deprived the ministry of $1,462,123. This loss from the C&D is growing worse and, unless remedied by the court, will grow worse until all Washington members are gone.

167.    As of November 20, 2020, the integrated OneShare Ministry had members in all 50 states and active operations (enrolling new members) in all states except Maryland, Pennsylvania, Vermont, and (now) Washington. Total membership included about 53,000 total members from both parts of the integrated OneShare Ministry, including about 5,000 Anabaptist Christians (predominantly Mennonite) and about 48,000 non-Anabaptist Christians (Baptists, Presbyterians, non-denominational Christian, etc.). Total membership includes both primary members (who commit to make the health care sharing contributions) and their dependent members.

168.    Prior to April 1, 2020, when the OIC published its C&D, the OneShare Ministry had approximately 25,348 active primary members nationwide. As of November 20, 2020, the Ministry had approximately 25,712 active primary members nationwide, showing nationwide growth of 364 (1.4%). (Since the OneShare Ministry does not currently have Anabaptist members in Washington, these membership statistics focus on non-Anabaptist members both as to Washington and nationwide.)

169.    On April 1, 2020, OIC published its March 31, 2020 C&D against OneShare's ministry, preventing OneShare from enrolling new members in Washington. The press release announcing the C&D proclaimed that OneShare was a "sham health care sharing ministry that is preying on people who think they are buying health insurance."

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

170.    On March 31, 2020, before the published announcement of the C&D, the OneShare Ministry had 2,713 primary members in Washington, which was its third largest state membership, just behind Texas (2,765) and California (2,974).

171.    From April 1 to November 20, 2020, primary members in Washington fell from 2,713 to 1,875, for a loss of 838 (30.9%) such members in Washington. This loss of 30.9% in Washington occurred while primary membership rose by 364 members (1.4%) nationwide—despite the loss in Washington. If Washington's membership had merely held steady, nationwide membership would have risen by 1,202 (364 + 838), or 4.7%. This harm in Washington resulted directly from its action against OneShare.

172.    As stated, in terms of lost contributions, from April 1, 2020 to November 20, 2020, the loss of 838 Washington members, compared to membership growth nationwide, deprived the OneShare Ministry of no less than $1,462,123. This loss from C&D is growing worse and, unless remedied by the Court, will grow worse until all Washington members are gone. In terms of lost reputation and lost fellowship, the harm is irreparable.

173.    The harm to OneShare far exceeds lost contributions. While it certainly means fewer resources to meet the needs of OneShare members in Washington and nationwide, it also means fewer resources to reach lost souls for Jesus Christ in Washington and nationwide. As Jesus asked rhetorically, "What can anyone give in exchange for their soul?" *Mark* 8:37. The reputational harm exceeds defamation or stigma and caused profound loss on more than one level.

174.    Moreover, the C&D and press release were uniquely offensive and harmful to OneShare's Bible-based Christian ministry and to the Ministry's existing and prospective members drawn largely from Bible-based Christian believers.

175.    The use of the term "preying" evokes familiar Biblical references to lions pursuing, carrying off, violently killing, and devouring their victims. *See, e.g.*, *Numbers* 23:24; *Isaiah* 5:29; *Nahum* 2:12; *Ezekiel* 22:25; *Ezekiel* 19:6; *Ezekiel* 19:3; *Genesis* 49:9; *Job* 4:11; *Job* 38:39; *Psalm* 104:21; *Amos* 3:4. This imagery further evokes the Bible's references to the Christian's great spiritual enemy: "Your enemy the devil prowls around like a roaring lion looking for someone to

devour." I *Peter* 5:8. To equate OneShare with that enemy, the embodiment of evil, was among the most stigmatizing things that could have been said about OneShare, and particularly to its existing and prospective members in Washington and nationwide who share these biblical beliefs.

176.    The derogatory and defamatory press release leaves OneShare's past, present, and prospective members with a sense that OneShare is not what they think it is, a faith-based ministry focused on serving members honestly and diligently. OIC's defamation is discouraging people of faith from participating in OneShare, or any HCSM, and forcing them back to choosing among options that they do not want and that do not meet their needs.

177.    Defendants' defamation has tainted and stigmatized the entire OneShare Ministry, harming it not just in Washington but nationwide. The defamatory press release has harmed OneShare in its dealings with regulatory officials in other states. The derogatory remarks about OneShare were broadcast by OIC to insurance regulators across all jurisdictions in which OneShare operates—including places where more robust safe harbor statutes exist.

178.    A number of state high-ranking insurance regulators in several states have expressed concerns to members of OneShare's regulatory compliance team on the basis of the OIC's C&D and press release.

179.    In addition, following Defendants' actions, class action lawyers added OneShare as a defendant to existing class action lawsuits in California and Colorado, and to a new one in Kentucky filed this past Friday, December 11, 2020. All three lawsuits now borrow OIC's claim that OneShare is a "sham HCSM" preying on the public." *E.g.*, *Duncan v. Aliera Cos., OneShare Health, et. al*, No. 2:20-CV-867 (E.D. Cal.), Amended Complaint filed July 1, 2020 at ¶13 (parent Anabaptist "create[d] defendant [OneShare] as a sham HCSM"). Without such a claim, there was no basis for adding OneShare to any of this litigation. Further litigation is currently being threatened against OneShare. Discovery reveals that the same Seattle-based lawyers who filed the California, Colorado, and Kentucky lawsuits and know Defendant Kreidler spoke with him about such a lawsuit the day before they filed their first one, in Seattle. Each suit can destroy the Ministry.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

**N.     The Hostility and Inadequacy of the OIC Forum**.

180.     Defendant Kreidler and the OIC have a long history of disfavoring HCSMs operating in Washington State.

181.     In 2011, Defendant Kreidler pursued HCSM Samaritan Ministries until the Washington legislature and governor enacted the state safe harbor in RCW 48.43.009.

182.     In 2014, Defendant Kreidler's office was accused of overzealous implementation of the ACA and pressuring administrative law judges to rule in favor of OIC initiatives. *See* https://www.seattletimes.com/opinion/editorial-allegations-of-misconduct-in-office-of-the-insurance-commissioner-demand-reform ("NO one should threaten a judge …. [OIC Judge] Patricia Petersen sometimes has to tell Insurance Commissioner Mike Kreidler he is wrong. A judge for 19 years, she has ruled against the agency in a number of high-profile cases affecting health reform implementation, a major task for Kreidler…. [Eventually, she was told:] Before issuing rulings, she needed to ask Kreidler how he wanted her to rule.").

183.     In the current HCSM "talking points" that OIC uses to advise the public, OIC leads with this warning: "***Consumers should be aware that HCSMs are not ACA compliant***." That misleading warning suggests hostility to HCSMs—which *are* ACA compliant if they comply with the ACA's HCSM exemption in 5000A.

184.     In his September 15, 2020 Consumer Alert, beneath a supersized heading, ***Tips for Avoiding Scams***, and its oversized subheading, ***Buyer Beware***, Defendant Kreidler states, "***Closely examine any offers, especially one that could be a health care sharing ministry***." https://www.insurance.wa.gov/news/consumer-alert-beware-suspicious-offers-cheap-health-insurance?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=. (Emphasis added.)

185.     It thus appears that OIC views HCSMs as *shams* and *scams* hiding behind religion.

186.     Moreover, OIC has shown particular hostility toward OneShare. As stated above, a search for "prey" in OIC press releases in its online newsroom reveals a total of 25 results dating to 2013. In these results, OIC stated unequivocally that preying upon vulnerable people was the

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

worst form of insurance fraud, and then proceeded to apply that description only to OneShare. In no other press release did OIC accuse any organization, let alone a religious organization, of preying on the public, let alone its own vulnerable members and prospective members. In other words, OIC targeted OneShare for the harshest of treatment.

187.    OIC clearly is an inadequate forum to vindicate Plaintiffs' rights. Plaintiffs have no adequate remedy at law.

## V.  CLAIMS FOR RELIEF

## <u>COUNT I</u>

**DECLARATORY JUDGMENT REGARDING HCSM SAFE HARBOR
UNDER 26 U.S.C. § 5000A AND RCW 48.43.009 - 28 U.S.C. § 2201**

188.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

189.    Defendants deny that OneShare qualifies as an HCSM under 26 U.S.C. § 5000A and Washington RCW 48.43.009, which expressly adopts "the same meaning as" 5000A. Defendants have denied OneShare the HCSM safe harbor and subjected OneShare to an onerous C&D due to its purported failure to satisfy 5000A, even though CMS has previously determined that it qualified under 5000A.

190.    There is a real and actual controversy between Plaintiffs and Defendants regarding whether Defendants may undertake to act as described herein.

191.    OneShare's claim that it is entitled to Washington's safe harbor turns on the contested issue of whether OneShare meets the federal 5000A HCSM definition, and specifically its definition of "predecessor."

192.    The OIC's denial of safe harbor status to OneShare rests on an incorrect and arbitrary reading of the Section 5000A safe harbor that is assimilated into RCW 48.43.009.

193.    This issue is substantial: Proper interpretation of the definition of HCSM directly affects OneShare and 2,700 Washington members, as well as thousands of other Washingtonians

who wish to engage in constitutionally protected religious exercise by participating in HCSMs.

194.    Deciding this narrow statutory issue will not upset the federal-state balance: Rather, in assimilating the 5000A definition into state law, Washington's legislature expressly sought to have its regulatory power over HCSMs confined by the federal meaning in Section 5000A of the term "health care sharing ministry."

195.    Under 28 U.S.C. §§ 2201 and 2202, Plaintiffs are entitled to declaratory relief that OneShare qualifies as an HCSM under 26 U.S.C. § 5000A and Washington RCW 48.43.009 and injunctive relief preventing OIC from continuing to deny OneShare HCSM status.

196.    WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## COUNT II

### VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITU-TION – 42 U.S.C. §1983

197.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

198.    The Defendants' actions and the HCSM safe harbor, as interpreted by OIC, violate the Free Exercise, Establishment, Free Speech, and Free Assembly Clauses of the First Amendment. Defendants' actions: are non-neutral, non-generally applicable, and discriminatory toward religion and Plaintiffs' religious ministry, single out Plaintiffs' ministry for especially harsh treatment, substantially burden the exercise of Plaintiffs' sincere religious beliefs and exercise, subject the Plaintiffs to unconstitutional denominational discrimination and unconstitutional entanglement of church and state, interfere with Plaintiffs' chosen polity and religious autonomy, abridge Plaintiffs' freedom of speech and association, and are neither rational nor the least restrictive means of serving any overriding or compelling governmental interest.

199.    Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

200.    Defendants' conduct, undertaken under color of state law, constitutes a violation of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -37-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1  Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

2  201.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue

3  to be damaged.

4  202.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating its con-

5  stitutional and civil rights.

6  203.    WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set

7  forth hereinafter in the prayer for relief.

8  ## COUNT III

9  **VIOLATION OF THE EQUAL PROTECTION AND DUE PROCESS**
**CLAUSES OF THE FOURTEENTH AMENDMENT TO THE U.S.**
10  **CONSTITUTION - 42 U.S.C. §1983**

11  204.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

12  set forth herein.

13  205.    The Defendants' actions and the HCSM safe harbor, as interpreted by OIC, violate

14  the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Defendants' actions:

15  unconstitutionally discriminate against Plaintiffs based on the suspect classification of religion,

16  interfere with Plaintiffs' religious free exercise and other fundamental rights, defame Plaintiffs in

17  connection with deprivation of their protected liberty and/or property interests, constitute uncon-

18  stitutional stigma-plus discrimination, and are neither rational nor the least restrictive means of

19  serving any overriding or compelling governmental interest.

20  206.    Defendants' conduct, undertaken under color of state law, constitutes a violation of

21  Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

22  207.    Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer

23  imminent and irreparable harm.

24  208.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue

25  to be damaged.

26  209.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating its con-

27  stitutional and civil rights.

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

210.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

211.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment as follows:

a.   That the Court enter a declaratory judgment that OneShare Health qualifies as an HCSM under 26 U.S.C. § 5000 and RCW 48.43.009.

b.   That the Court enter judgment on behalf of Plaintiffs against Defendants for violations of their First and Fourteenth Amendment rights.

c.   That the Court issue a declaratory judgment that Defendants' conduct as complained herein was a violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

d.   That the Court issue declaratory and injunctive relief, including but not limited to a (a) preliminary injunction and (b) permanent injunction, each enjoining Defendants (i) to withdraw and to cease from enforcing against Plaintiff OneShare Health a Cease and Desist Order prohibiting OneShare from enrolling new members within the State of Washington; (ii) to cease all pending administrative proceedings by the OIC against OneShare; and (iii) to withdraw their press release describing OneShare as a "sham" health care sharing ministry "preying" upon Washington residents and to issue a corrective press release in a form acceptable to OneShare.

e.   That the Court order Defendants to pay Plaintiff's attorneys' fees and costs as authorized by 42 U.S.C. § 1988, prejudgment interest, and any other relief deemed necessary and proper; and

f.   That the Court award such equitable, injunctive or other further relief as the Court may deem just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                                    -39-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

1    DATED: December 15, 2020                  Respectfully submitted,

2                                              /s/ John C. Roberts Jr.
                                               John C. Roberts Jr., WSBA #44945
3                                              **WILSON SONSINI GOODRICH & ROSATI, P.C.**
                                               701 Fifth Avenue, Suite 5100
4                                              Seattle, WA 98104-7036
                                               Telephone: (206) 883-2500
5                                              Email: jroberts@wsgr.com

6
                                               Michael W. McConnell*
7                                              **WILSON SONSINI GOODRICH & ROSATI, P.C.**
                                               650 Page Mill Road
8                                              Palo Alto, CA 94304-1050
                                               Telephone: (650) 493-9300
9                                              Email: mmconnell@wsgr.com

10
                                               Steffen N. Johnson*
11                                             **WILSON SONSINI GOODRICH & ROSATI, P.C.**
                                               1700 K Street NW, Fifth Floor
12                                             Washington, DC 20006
                                               Telephone: (202) 973-8800
13                                             Email: sjohnson@wsgr.com

14
                                               Derek Gaubatz*
15                                             Scott J. Ward*
                                               J. Matthew Szymanski*
16                                             **GAMMON & GRANGE, P.C.**
                                               8280 Greensboro Drive, Suite 140
17                                             McLean, VA 22102-3884
                                               Telephone: (703) 761-5030
18                                             Email: jms@GG-Law.com
19
                                               *Counsel for Plaintiffs OneShare International,
20                                             OneShare Health, and Reverend Pamela Woodson*

21
                                               *Pro hac vice applications submitted concurrently
22                                             herewith

23

24

25

26

27

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 3:20-cv-6207                          -40-